# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3437

_____

United States of America

*Plaintiff - Appellee*

v.

Shannon E. Williams, also known as Donald Jarmon, also known as Thumbs

*Defendant - Appellant*

_____

No. 12-1941

_____

United States of America

*Plaintiff - Appellee*

v.

$1,000.00 refunded to Mango Creek Properties, Inc. from GBS Partners, Inc. seized on January 28, 2010; $1,000.00 seized on December 22, 2009 from Spence Escrow Company from an escrow account holding money for Deshawn Hernandez; $85,120.00 in United States currency seized from safe deposit box number 29 at Pinnacle Bank on December 18, 2009; $15,545.95 seized from Pinnacle Bank Account No. 6912183410 in the name of Mango Creek Properties, Inc. on December 18, 2009; $1,445.00 in United States currency delivered to Terry Haddock by Deshawn Hernandez on May 27, 2009 and on July 6, 2009; North 91.5 Feet, West 28 Feet, Lot 6, in the North 91.5 Feet of Lot 7, Block 4, Parkers Addition, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 1923 N. 27th Street, Omaha, Nebraska, titled in the name of

Shannon Williams; Lot 12, Block 2, Hitchcock's 1st Addition, an Addition to the City of Omaha, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3744 Lake Street, Omaha, Nebraska, titled in the name of Shannon Williams; 3181 Pennington Cir. SW, Atlanta, Georgia, as surveyed, platted and recorded in Fulton County, Georgia, commonly known as 3181 Pennington Cir. SW, Atlanta, Georgia, titled in the name of E Zone Investments, LLC; Hastings & Heydens 3rd Add, Lot 14, Block 0, Lots 13 &82 x 120, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 2444 Browne Street, Omaha, Nebraska, titled in the name of Deshawn Hernandez; Fairfax, Lot 216, Block 0 40 x 134, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3721 N. 39th Street, Omaha, Nebraska, titled in the name of Mango Creek Properties, Inc.; Mossman &Wilson Add, Lot 106, Block 0, Lot 106, Block 0, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 2205 N. 39th Street, Omaha, Nebraska, titled in the name of Shannon Williams; Wilson Carl C2nd Add, Lot 20, Block 0 42 X 129.2, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 4527 N. 36th Avenue, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; Fontenelle Park, Lot 205, Block 0 40 X 130, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3916 N. 42nd, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; Yale Place, Lot 49, Block 0EX S 5 Ft 40 X 98.2, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3365 Erskine Street, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; West 38', East 76 Feet of Lots 16 and 17, and Lot 18, Block 4, Lowe's Subdivision, as surveyed, platted and recorded in Douglas County Nebraska, commonly known as 3106 Decatur Street, Omaha, Nebraska, titled in the name of Latreise Anderson

*Defendant*s

------------------------------

Shannon E. Williams

*Claimant - Appellant*

Violet Goodwin

-2-

*Interested party*

_____

No. 12-1949

_____

United States of America

*Plaintiff - Appellee*

v.

$1,000.00 refunded to Mango Creek Properties, Inc. from GBS Partners, Inc. seized on January 28, 2010; $1,000.00 seized on December 22, 2009 from Spence Escrow Company from an escrow account holding money for Deshawn Hernandez; $85,120.00 in United States currency seized from safe deposit box number 29 at Pinnacle Bank on December 18, 2009; $15,545.95 seized from Pinnacle Bank Account No. 6912183410 in the name of Mango Creek Properties, Inc. on December 18, 2009; $1,445.00 in United States currency delivered to Terry Haddock by Deshawn Hernandez on May 27, 2009 and on July 6, 2009; North 91.5 Feet, West 28 Feet, Lot 6, in the North 91.5 Feet of Lot 7, Block 4, Parkers Addition, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 1923 N. 27th Street, Omaha, Nebraska, titled in the name of Shannon Williams; Lot 12, Block 2, Hitchcock's 1st Addition, an Addition to the City of Omaha, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3744 Lake Street, Omaha, Nebraska, titled in the name of Shannon Williams; 3181 Pennington Cir SW, Atlanta, Georgia, as surveyed, platted and recorded in Fulton County, Georgia, commonly known as 3181 Pennington Cir. SW, Atlanta, Georgia, titled in the name of E Zone Investments, LLC; Hastings & Heydens 3rd Add, Lot 14, Block 0, Lots 13 &82 x 120, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 2444 Browne Street, Omaha, Nebraska, titled in the name of Deshawn Hernandez; Fairfax, Lot 216, Block 0 40 x 134, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3721 N. 39th Street, Omaha, Nebraska, titled in the name of Mango Creek Properties, Inc.; Mossman &Wilson Add, Lot 106, Block 0, Lot 106, Block 0, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 2205 N. 39th Street, Omaha, Nebraska,

-3-

titled in the name of Shannon Williams; Wilson Carl C2nd Add, Lot 20, Block 0 42 X 129.2, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 4527 N. 36th Avenue, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; Fontenelle Park, Lot 205, Block 0 40 X 130, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3916 N. 42nd, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; Yale Place, Lot 49, Block 0EX S 5 Ft 40 X 98.2, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3365 Erskine Street, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; West 38', East 76 Feet of Lots 16 and 17, and Lot 18, Block 4, Lowe's Subdivision, as surveyed, platted and recorded in Douglas County Nebraska, commonly known as 3106 Decatur Street, Omaha, Nebraska, titled in the name of Latreise Anderson

*Defendant*s

------------------------------

Shannon E. Williams

*Claimant - Appellant*

Violet Goodwin

*Interested party*

_____

No. 13-1200

_____

United States of America

*Plaintiff - Appellee*

v.

$1,000.00 refunded to Mango Creek Properties, Inc. from GBS Partners, Inc. seized on January 28, 2010; $1,000.00 seized on December 22, 2009 from Spence

-4-

Escrow Company from an escrow account holding money for Deshawn Hernandez; $85,120.00 in United States currency seized from safe deposit box number 29 at Pinnacle Bank on December 18, 2009; $15,545.95 seized from Pinnacle Bank Account No. 6912183410 in the name of Mango Creek Properties, Inc. on December 18, 2009; $1,445.00 in United States currency delivered to Terry Haddock by Deshawn Hernandez on May 27, 2009 and on July 6, 2009; North 91.5 Feet, West 28 Feet, Lot 6, in the North 91.5 Feet of Lot 7, Block 4, Parkers Addition, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 1923 N. 27th Street, Omaha, Nebraska, titled in the name of Shannon Williams; Lot 12, Block 2, Hitchcock's 1st Addition, an Addition to the City of Omaha, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3744 Lake Street, Omaha, Nebraska, titled in the name of Shannon Williams; 3181 Pennington Cir SW, Atlanta, Georgia, as surveyed, platted and recorded in Fulton County, Georgia, commonly known as 3181 Pennington Cir. SW, Atlanta, Georgia, titled in the name of E Zone Investments, LLC; Hastings & Heydens 3rd Add, Lot 14, Block 0, Lots 13 &82 x 120, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 2444 Browne Street, Omaha, Nebraska, titled in the name of Deshawn Hernandez; Fairfax, Lot 216, Block 0 40 x 134, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3721 N. 39th Street, Omaha, Nebraska, titled in the name of Mango Creek Properties, Inc.; Mossman &Wilson Add, Lot 106, Block 0, Lot 106, Block 0, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 2205 N. 39th Street, Omaha, Nebraska, titled in the name of Shannon Williams; Wilson Carl C2nd Add, Lot 20, Block 0 42 X 129.2, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 4527 N. 36th Avenue, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; Fontenelle Park, Lot 205, Block 0 40 X 130, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3916 N. 42nd, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; Yale Place, Lot 49, Block 0EX S 5 Ft 40 X 98.2, as surveyed, platted and recorded in Douglas County, Nebraska, commonly known as 3365 Erskine Street, Omaha, Nebraska, titled in the name of E Zone Investments, LLC; West 38', East 76 Feet of Lots 16 and 17, and Lot 18, Block 4, Lowe's Subdivision, as surveyed, platted and recorded in Douglas County Nebraska, commonly known as 3106 Decatur Street, Omaha, Nebraska, titled in the name of Latreise Anderson

*Defendant*s

-5-

-------------------------------

Shannon E. Williams

*Claimant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska – Omaha

_____

Submitted: February 13, 2013
Filed: July 11, 2013

_____

Before SMITH, MELLOY, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Shannon Williams was indicted and convicted by jury of conspiring to distribute and possess with the intent to distribute 1000 kilograms or more of marijuana and of laundering the related proceeds. The indictment also contained a criminal forfeiture count for certain real and tangible properties obtained as a result of the conspiracy. After Williams's trial, both Williams and the government moved to dismiss the forfeiture count—Williams with prejudice and the government without prejudice—due to a procedural error. The district court denied Williams's motion and granted the government's motion, and the government subsequently instituted a civil *in rem* forfeiture action for the same properties. These consolidated cases pertain to Williams's direct appeal of his criminal convictions and his appeal of the dismissal motions pertaining to the criminal forfeiture count and the *in rem* civil action.

-6-

For the reasons set forth below, we affirm the district court[1] and deny relief to Williams in all respects.

## I.  Direct Appeal of Criminal Convictions

### A.  Factual Background[2]

Since at least as early as 2006, Williams was involved in a conspiracy to import marijuana into the Omaha, Nebraska metropolitan area (the "marijuana conspiracy"). Williams met Richard Conway at a halfway house in 2006, and Conway subsequently became involved in the marijuana conspiracy.  Conway and several other individuals were arrested in October 2008 in Omaha after they accepted delivery of a controlled shipment of marijuana from another one of Williams's associates.  Williams paid his attorney, Eric Whitner, to represent Conway in connection with the marijuana charges.[3]  Conway wanted to cooperate with the government, however, and agreed to provide information to law enforcement regarding Williams's involvement in the marijuana conspiracy.  Because Conway feared that Whitner would tell Williams about his cooperation with the government, Conway wanted to speak to law enforcement outside of Whitner's presence and began associating with attorney Terry Haddock, whom Conway met through one of the other individuals arrested alongside him in Omaha.

---

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

[2]The facts underlying Williams's convictions are complex and involve several players, some who wore multiple hats at different points in time.  Additional facts not set forth immediately below will be discussed as they become relevant to the individual issues raised on appeal.

[3]Williams had previously paid a retainer to Whitner to represent Conway in connection with an unrelated firearm charge stemming from a July 2008 indictment.

Conway believed that attorney Whitner was also involved in the marijuana conspiracy, and attorney Haddock encouraged Conway to further cooperate with the government by wearing a recording device during his next meeting with Whitner. Conway recorded his next conversation with Whitner but refused to record any further meetings because he believed that Whitner was suspicious of him. Whitner subsequently arranged for Conway to be represented by a third attorney and shortly thereafter withdrew as Conway's counsel; Haddock remained as Conway's co-counsel.

Prior to withdrawing as Conway's counsel and throughout his representation of Conway, attorney Whitner routinely smuggled a cell phone into the detention center where Conway was being held for Conway to contact Williams. After Whitner withdrew from representing Conway, attorney Haddock provided this same service to Conway, who told Williams about Haddock. Detention-center officials were aware that Haddock was providing Conway with a cell phone but allowed it because Conway was continuing to cooperate with the government by providing information about Williams.

In late 2008, Williams began contacting attorney Haddock directly. Williams and Haddock discussed, *inter alia*, the marijuana charges pending against Conway. In one conversation, Williams indicated that he intended to kill two key witnesses against Conway; Haddock reported the threat to law enforcement. Williams also asked Haddock on behalf of a friend (Dion) about the sentencing disparity between "crack" cocaine and powder cocaine per the U.S. Sentencing Guidelines Manual, a topic on which Haddock had written an academic research paper while in college. Williams and Haddock also discussed a 2007 arrest warrant for Williams in Nebraska for violating conditions of his supervised release. At all times, Williams was

-8-

represented by either Whitner or his cocounsel, attorney Steve Lefler—not Haddock.[4] In January 2009, Williams (through two of his associates) paid a total of $15,000 to Haddock for legal services that Haddock provided to Conway and another one of Williams's friends.

Williams was arrested in Arizona on January 16, 2009, for possessing with the intent to sell several hundred pounds of marijuana, possessing drug paraphernalia, and forgery. By the time law-enforcement officials in Nebraska learned of Williams's arrest, and before the Nebraska authorities could alert the Arizona authorities that Williams was wanted in Nebraska for violating his supervised release, Williams made bail in Arizona under a fake name ("Donald Jarmon"). Attorney Haddock continued to stay in contact with Williams and continued to pass along information to law enforcement regarding Williams's whereabouts. On February 19, 2009, due in part to Haddock's tips, Williams was arrested in Minnesota and subsequently transported to Nebraska.

Haddock worked with law-enforcement officials to place Conway in a cell with Williams so that Conway could extract more information from Williams regarding Williams's involvement in the marijuana conspiracy. Haddock hoped that Conway's cooperation would result in leniency for Conway, but law-enforcement officials made no promises to either Haddock or Conway. On April 1, 2009, Conway recorded a 5 hour, 45 minute conversation with Williams in which Williams made incriminating statements regarding the marijuana conspiracy.

Although Whitner had withdrawn as Conway's attorney, he continued to represent Williams and brought a cell phone to Williams so that Williams could direct operations for the marijuana conspiracy from inside the detention center. Williams

---

[4]Whitner passed away in August 2009, at which time Lefler assumed the role of Williams's primary counsel regarding Williams's supervised-release violation.

-9-

subsequently began to distrust Whitner and asked Conway if attorney Haddock would bring a phone into the detention center for Williams to use.  Williams agreed to pay Haddock $1000 per month for the service.  Haddock alerted the authorities about Williams's offer, and authorities devised a plan to record Williams's phone conversations to obtain information about the marijuana conspiracy.  Haddock testified at trial that he agreed to provide the cell-phone service to Williams because he feared what would happen to him if he did not agree based on Williams's previous threat to murder witnesses.

Haddock made a total of sixty-three visits to see Williams between April and December of 2009, and each of those meetings occurred in the attorney–client meeting room.  Haddock repeatedly told Williams that he was not Williams's attorney, but during some of Williams's phone conversations Williams referred to Haddock as his attorney and Haddock did not correct him.  The district court found that Haddock did not correct Williams because Haddock believed that Williams was referring to him as his attorney as a code for the person with whom Williams was speaking to know that the phone calls were not being monitored and that he or she could speak freely.  During each of Haddock's visits to Williams, detention-center officials knew that Haddock was operating as an informant on Williams and was not Williams's actual attorney.  Haddock, however, convinced Williams that the detention-center officials thought that he was Williams's attorney and that was why he was allowed to see Williams, even though Williams knew that Haddock was not his attorney.

In June 2009, Haddock began helping Williams launder drug money through a business entity, Mango Creek Properties.  Williams paid Haddock $3000 for every $50,000 that Haddock laundered, and Haddock surrendered to law enforcement all funds that Williams paid to him.

-10-

On December 16, 2009, Williams and ten other individuals were indicted for conspiring to distribute and possess with the intent to distribute 1000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841 and 846 ("Count I") and money laundering in violation of 18 U.S.C. §§ 2 and 1956 ("Count II").  The indictment also included a criminal forfeiture count pursuant to 21 U.S.C. § 853 for certain of Williams's real and tangible properties obtained as a result of the Count I conspiracy. A substantively identical superseding indictment issued July 20, 2010.

Prior to trial, Williams moved to dismiss the indictment or, alternatively, suppress the statements that he made to attorney Haddock; the district court denied Williams's motion.  Williams also moved to suppress statements that he made to Conway on April 1, 2009; the district court denied that motion as well.

A jury convicted Williams on April 28, 2011, of Count I and Count II of the superseding indictment.  Williams was sentenced to 480 months' imprisonment and ten years of supervised release for the Count I conviction, and 240 months' imprisonment and three years of supervised release for the Count II conviction, to run concurrently.

On appeal, Williams raises three principal arguments pertaining to his convictions.  First, Williams contends that the district court erred by not granting his motion to dismiss the indictment or, alternatively, suppress the statements that he made to Haddock.  Williams next argues that the district court erred by denying his motion to suppress the government's recording of his April 1, 2009 conversation with Conway.  Finally, Williams claims that the district court's trial conduct created a judicial bias in the jury against Williams.  We address each argument in turn below.[5]

_____

[5]This Court granted leave to Williams to file a *pro se* brief in which Williams raised several additional arguments pertaining to his convictions.  We have considered those arguments and address them below at Part I.E of this opinion to the extent that they warrant discussion.

B. Motion to Dismiss the Indictment and Suppress Statements to Haddock

Williams asserts that the district court erred by not dismissing the superseding indictment or, alternatively, by not suppressing statements that he made to attorney Haddock. Specifically, Williams claims that the government engaged in outrageous conduct by "hijacking" his attorney–client relationship with Haddock and "making defense counsel an agent of the prosecution," thus violating his Due Process rights. See United States v. Searcy, 233 F.3d 1096, 1101 n.3 (8th Cir. 2000) ("The claim of outrageous government conduct rests on the Due Process Clause of the Fifth Amendment." (citing United States v. Russell, 411 U.S. 423, 431–32 (1973))). On a motion to dismiss an indictment for outrageous government conduct, this Court reviews the district court's legal determinations *de novo* and reviews factual findings for clear error. United States v. Nieman, 520 F.3d 834, 838 (8th Cir. 2008). These same standards govern our review of a district court's decision on a motion to suppress statements. United States v. Coleman, 700 F.3d 329, 334 (8th Cir. 2012).

1. Legal Framework

"The defense of outrageous government conduct is similar to, although different from, the defense of entrapment. Whereas the defense of entrapment focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the *government's* actions." United States v. Hunt, 171 F.3d 1192, 1195 (8th Cir. 1999) (emphasis added). "[T]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." United States v. King, 351 F.3d 859, 867 (8th Cir. 2003) (citation and internal quotation marks omitted); United States v. Bugh, 701 F.3d 888, 894 (8th Cir. 2012) ("Outrageous Government conduct requires dismissal of a charge 'only if it falls within the narrow band of the most intolerable government conduct.'" (quoting United States v. Morse, 613 F.3d 787, 792–93 (8th Cir. 2010))); Hunt, 171 F.3d at 1195 ("[G]overnment

-12-

agents 'may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process.'" (quoting United States v. Kummer, 15 F.3d 1455, 1460 (8th Cir. 1994))).

This Court has not had occasion to opine on governmental intrusion into an attorney–client relationship in the context of the Due Process Clause of the Fifth Amendment. Cf., e.g., United States v. Tyerman, 701 F.3d 552, 559 (8th Cir. 2012) (discussing a defendant's Sixth Amendment ineffective-assistance-of-counsel claim based on governmental intrusion into an attorney–client relationship). The district court noted, however, that other circuits have adopted a three-pronged test for determining whether there is a "colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney–client relationship." United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996). That test requires the defendant alleging an intrusion to prove the following: "(1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice." Id. (footnote omitted); see, e.g., United States v. Stringer, 535 F.3d 929, 941 (9th Cir. 2008) (applying Voigt's test); United States v. Kennedy, 225 F.3d 1187, 1195 (10th Cir. 2000) (same).

Of course, for there to be an intrusion into an attorney–client relationship, there must first be an attorney–client relationship. When determining whether two parties have formed such a relationship, this Court applies state law. See, e.g., Manion v. Nagin, 394 F.3d 1062, 1068 (8th Cir. 2005); Macawber Eng'g, Inc. v. Robson & Miller, 47 F.3d 253, 256 (8th Cir. 1995). In Nebraska—where Williams was indicted and detained and where Haddock visited him at the detention center—"[a]n attorney–client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." State ex rel. Stivrins v.

-13-

Flowers, 729 N.W.2d 311, 317 (Neb. 2007).  Williams, as the party alleging an unconstitutional intrusion into an attorney–client relationship, bears the burden of proving the relationship's existence.  See Hollins v. Powell, 773 F.2d 191, 196 (8th Cir. 1985) ("[T]he party who claims the benefit of the attorney–client privilege has the burden of establishing the right to invoke its protection."); Greenwalt v. Wal-Mart Stores, Inc., 567 N.W.2d 560, 566 (Neb. 1997).  Whether an attorney–client relationship exists is a factual determination that we review for clear error.[6]  United States v. Rouse, 410 F.3d 1005, 1010 (8th Cir. 2005).

## 2.  Analysis

In considering Williams's claim of outrageous government conduct, the district court stated that the facts of Voigt are "analogous to Williams'[s] . . . situation." Williams, 2011 WL 1058920, at *12.  A review of Voigt's facts, however, shows that it is distinguishable for an important reason: the defendant in Voigt honestly believed that the informant was his attorney and, in fact, the informant *was* the defendant's attorney.  See 89 F.3d at 1061–63 (detailing the dual roles of the defendant's attorney as both counsel and informant, and noting that the government several times admonished the defendant's attorney for what it perceived as a conflict of interests). By contrast, the record in this case demonstrates that Williams did not honestly believe that Haddock was his attorney, nor was Haddock acting as Williams's legal

---

[6]It is unclear to us whether the district court found that an attorney–client relationship existed between Haddock and Williams.  The district court noted that "little evidence was produced at the hearing indicating that Haddock formed an attorney–client relationship with Williams," United States v. Williams, No. 8:09CR457, 2011 WL 1058920, at *14 (D. Neb. Mar. 21, 2011), but continued to analyze the government's conduct under the Voigt test as though such a relationship did exist.  The district court appears to have grounded its determination that there was no constitutional violation on the basis that the government did not act outrageously, *i.e.*, did intrude into an attorney–client relationship—not on the premise that Haddock was never Williams's attorney.  See id. at *18.

-14-

counsel.  As we explain below, because we do not believe that there was an attorney–client relationship between Haddock and Williams, we need not proceed to analyze Williams's claim under the <u>Voigt</u> test, as that test is wholly premised on an attorney–client relationship existing in the first instance.  <u>See id.</u> at 1067 & n.6.

We begin with the first prong of the Nebraska test for determining whether an attorney–client relationship exists: "a person [must] seek[] advice or assistance from an attorney."  <u>Flowers</u>, 729 N.W.2d at 317.  Williams claims that he satisfies this requirement because he asked Haddock about the sentencing disparity between "crack" cocaine and powder cocaine and, after he was arrested, asked Haddock about the case against him regarding his supervised-release violation.  Although Haddock did talk to Williams about the sentencing disparity, these conversations were not sufficient to establish an attorney–client relationship for several reasons.  First, Williams asked about the disparity for one of his friends (Dion)—who at the time was in jail for being involved in a crack conspiracy—not for himself.  While there is nothing in the record showing that Williams ever reported back to Dion what Haddock told him, we find it difficult to believe that these conversations "were not intended to be disclosed to third persons." <u>Id.</u> (attorney–client privilege attaches only where there is "a reasonable expectation that . . . discussions . . . were confidential").  Second, Williams's conversations with Haddock regarding sentencing for cocaine took place in January 2009, *i.e.*, *before* Williams was arrested in Minnesota and subsequently detained in Omaha.  We do not dispute Williams's claim that he and Haddock communicated by telephone prior to his arrest or that, "[w]hile still a fugitive, Mr. Williams developed a relationship with Terry Hadock"; we simply do not think that Williams formed an *attorney–client* relationship with Haddock during that time period.[7]  <u>See</u> *In re* Estate of Miller, 99 N.W.2d 473, 476 (Neb. 1959) ("[A] communication to be privileged from disclosure must relate to a professional matter

---

[7]That is not to say that Williams and Haddock ever formed an attorney–client relationship at some later point in time; we do not believe that they did.

-15-

and must have been made because of the relationship *then existing* of attorney and client." (emphasis added)).

Finally, Williams concedes that his conversations with Haddock regarding the sentencing disparities for different types of cocaine were among "a mix of social exchanges and discussions regarding legal issues of importance to Mr. Williams." Conversations of this nature do not suffice to form an attorney–client relationship. See Restatement (Third) of the Law Governing Lawyers § 14 cmt. *c* (2000) ("[A] lawyer may answer a general question about the law, for instance in a purely social setting, without a client–lawyer relationship arising.").[8] The same is true with respect to Williams's conversations with Haddock about his supervised-release violation. The district court found that those conversations likewise consisted of "general legal questions akin to what a non-lawyer would ask a lawyer at a party" and thus "were not sufficient to form an attorney–client relationship." Williams, 2011 WL 1058920, at *15.  It does not follow that Haddock became Williams's attorney simply because Williams might have "perceived Haddock to be someone with a competence within the areas for which he sought counsel" and asked Haddock for generalized legal information.[9]  See Sheinkopf v. Stone, 927 F.2d 1259, 1265 (1st Cir. 1991) ("To imply an attorney–client relationship, . . . the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing, who happens to

---

[8]The Nebraska Supreme Court frequently relies upon the Restatement (Third) of the Law Governing Lawyers. E.g., Thomas & Thomas Court Reporters, L.L.C. v. Switzer, 810 N.W.2d 677, 683–84 & n.12, 13 (Neb. 2012); Hauptman, O'Brien, Wolf & Lathrop, P.C. v. Turco, 735 N.W.2d 368, 374 & n.19 (Neb. 2007); State ex rel. Counsel for Discipline v. James, 673 N.W.2d 214, 223 (Neb. 2004).

[9]While not dispositive, we note that at all times when Haddock visited Williams at the detention center, Williams was represented by other counsel of record for the violation of his supervised release.  See supra note 4.  While Haddock appeared as the sole attorney for Conway at a proffer interview, there is no indication in the record that Haddock ever represented Williams in an official capacity.

-16-

be *a* lawyer, has become *his* lawyer."); see also Diversified Indus. v. Meredith, 572 F.2d 596, 612 (8th Cir. 1977) (en banc) (Henley, J., concurring in part and dissenting in part) ("A communication is not privileged simply because one of the parties to it is a lawyer.").

Notwithstanding our analysis above, the notion that Haddock and Williams maintained an attorney–client relationship dissolves when we consider the subject matter and nature of their conversations and dealings and the type of "assistance" that Williams asked Haddock to provide to him.  Williams asked Haddock to, *inter alia*, (1) smuggle a cell phone and other contraband into the detention center for him in violation of detention center's policy and in furtherance of the marijuana conspiracy; (2) launder money for him; (3) receive money from various members of the marijuana conspiracy for the purpose of laundering; and (4) transport money for him in furtherance of the marijuana conspiracy.  None of those activities "pertains to matters within [Haddock's] professional competence" as an *attorney*, as opposed to a criminal enabler.  Flowers, 729 N.W.2d at 317; see *In re* BankAmerica Corp. Sec. Litig., 270 F.3d 639, 641 (8th Cir. 2001) ("[I]t is well established that the attorney–client privilege 'does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.'" (quoting United States v. Zolin, 491 U.S. 554, 563 (1989))).  This holds true for communications even when an attorney–client relationship *does* exist.  See Estate of Miller , 99 N.W.2d at 477 ("Mere relation of attorney and client does not, *ipso facto*, establish principle of attorney–client privilege, and if circumstances do not imply confidentiality to a communication between client and attorney the privilege does not attach . . . ." (alteration in original) (quoting Cafritz v. Koslow, 167 F.2d 749, 751 (D.C. Cir. 1948)) (internal quotation marks omitted); supra note 7.

Perhaps most telling of the fact that no attorney–client relationship ever formed between Williams and Haddock is Williams's continued express disavowal of any such relationship.  For example, on April 22, 2009, the following exchange took place

-17-

between Williams, Haddock, and one of Williams's friends on the phone that Haddock provided to Williams:

> HADDOCK: [Conway] said that you wanted me to stop and see you once a week or so.
>
> WILLIAMS: Yeah so I can use the phone. [Whitner]'s unreliable.
>
> .   .   .
>
> WILLIAMS [to FRIEND]: I finally got this guy down here to see me so I am able to call you . . . I got a new attorney man . . . .
>
> HADDOCK:  I am not your attorney.
>
> FRIEND:  You got a new attorney?
>
> WILLIAMS:  No just a new friend.

The next day, Williams made the following statement in reference to Haddock to the same friend: "[Haddock] does not represent [me and Conway], he is just a friend, he is a lawyer who is a friend."  While Haddock did not always correct Williams when Williams told people that Haddock was his attorney, testimony revealed that Williams's reference to Haddock as his attorney was a sort of code to alert people on the other end of the phone that they could speak freely.

On July 29, 2009, after Williams had several times asked Haddock to smuggle drugs and other contraband (in addition to the cell phone) into the detention center for him, Haddock made up a story that one of the detention-center guards confronted him about the number of visits he was making to Williams.  Haddock told Williams that he told the guard that he (Haddock) did not "appreciate an officer when I'm in

-18-

conversation with *my client* walking through the door [to the clergy/counsel room] without knocking." (Emphasis added.) Haddock used the "my client" language to lead Williams to believe that the detention-center officials thought that Haddock was acting as his attorney and that is why Haddock was allowed to visit him in the attorney–client room, even though there was an understanding between Williams and Haddock that Haddock was not Williams's attorney. Haddock later reiterated to Williams after this exchange that he was not Williams's attorney. For example, on August 21, 2009, Haddock told Williams, "You should be lucky that I am not your attorney or I would be charging you by the hour." Williams acknowledged the nature of their relationship, indicating that even if Haddock were his attorney, he "could cover it." Then, on September 1, 2009, Haddock cautioned Williams by stating that, "You have to be careful about telling people I'm your attorney."

Based on the above exchanges, we do not believe that Williams and Haddock had a mutual understanding that an attorney–client relationship existed between them. See, e.g., Gonzalez v. Union Pac. R.R. Co., 803 N.W.2d 424, 447 (Neb. 2011) (no attorney–client relationship existed where no evidence was presented that the person claiming existence of the relationship "understood herself to have such a relationship with [the attorney]"); see also Swanson v. Ptak, 682 N.W.2d 225, 230–31 (Neb. 2004) (no implied attorney–client relationship where lawyer's duties did not extend to the person claiming the relationship, despite the fact that the person held a "unilateral belief that [the attorney] was acting as her attorney" and such belief was "sincere").

For the reasons set forth above, we hold that Williams did not have an attorney–client relationship with Haddock and therefore the government could not have unconstitutionally intruded into any such relationship. Accordingly, the district

-19-

court did not err in denying Williams's motion to dismiss the superseding indictment or, alternatively, suppress statements that he made to Haddock.[10]

## C. Motion to Suppress Statements to Conway

Williams's second argument on appeal is that district court erred in denying his motion to suppress statements made to Conway. Specifically, Williams claims that his statements to Conway "were not the result of an independent decision to waive his previously asserted Fifth Amendment right to remain silent, but rather were [1] the involuntary response to an untenable situation where he was placed in a confined location with a government agent and subjected to questioning about [2] the very conduct for which he had previously asserted his right to remain silent."[11] Accordingly, we analyze the denial of Williams's motion to suppress on Fifth Amendment and Sixth Amendment grounds.[12]

─────────────────────

[10]Williams also argues that the indictment should be dismissed, or that his statements to Haddock should be suppressed, because Haddock allegedly violated his ethical obligations as an attorney, and such a violation constitutes outrageous government conduct. Williams's attempt to equate an alleged ethical violation with unconstitutional outrageous government conduct also fails. See United States v. Nguyen, 250 F.3d 643, 646 (8th Cir. 2001) (holding that a "government informant's breach of a treatment program's confidentiality requirement does not shock the conscience").

[11]The government concedes that Conway was acting as a government agent on April 1, 2009, when he recorded a nearly six-hour-long conversation with Williams.

[12]We note that in the brief by Williams's counsel, the heading of the section challenging the statements to Conway alleges a violation of Williams's Fifth Amendment right against self-incrimination, yet the standard of review references the Fourth Amendment. We fail to understand how the allegations in that section implicate Williams's Fourth Amendment right to be free from unreasonable search and seizure. However, based on certain statements in that same section of the brief by counsel, and out of an abundance of caution in view of Williams's decision to

-20-

As previously noted, we review *de novo* the district court's legal determinations on a motion to suppress and review factual findings for clear error.  Coleman, 700 F.3d at 334.  This Court will affirm the denial of a motion to suppress "unless the decision lacks the support of substantial evidence, is based on an erroneous view of the law, or [we are] left with a firm conviction that a mistake has been made." United States v. Esquivias, 416 F.3d 696, 699 (8th Cir. 2005) (citation and internal quotation marks omitted).

### 1.  Fifth Amendment Challenge

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Here, Williams argues that "[a]ny statements made to Mr. Conway . . . were not the product of [his] free will but rather [were] a product of fear for personal safety and were not voluntary."  Specifically, Williams claims that Conway was a member of the "Crip" gang, that Conway had authority over other gang members in their cell block, and that Conway leveraged that authority to get information from Williams. "The test for determining the voluntariness of a confession is whether the [government] extracted the confession by threats, violence, or direct or implied promises, such that the 'defendant's will [was] overborne and his capacity for self-determination critically impaired.'" United States v. Gannon, 531 F.3d 657, 661 (8th Cir. 2008) (alteration in original) (quoting United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995)). "In applying this test, we must consider the totality of the circumstances, including law-enforcement officials' conduct and the defendant's capacity to resist pressure." Id. "The government bears the burden of persuasion and must prove by a preponderance

---

proceed *pro se*, we also analyze (in addition to the Fifth Amendment claim) whether Williams's Sixth Amendment right to counsel was violated when Conway questioned him about the marijuana conspiracy without having an attorney present.

-21-

of the evidence the voluntariness of the challenged statements." United States v. Aguilar, 384 F.3d 520, 523 (8th Cir. 2004).

A review of the district court's factual findings does not reveal any coercion by Conway or any law-enforcement officials, and Williams's briefs do not refer to evidence of any such coercion beyond unsupported allegations. The majority of the 5 hour, 45 minute recorded conversation between Williams and Conway that took place on April 1, 2009, occurred in Williams and Conway's cell without anyone else present, and Conway did not make any threats or promises to Williams. Moreover, testimony from the suppression hearing revealed that Conway had previously withdrawn from the "Crip" gang and did not exude any influence over other detainees on his and Williams's cell block, let alone the influence to strong-arm Williams into divulging incriminating information to him. To the contrary, testimony demonstrated many of the individuals on Williams and Conway's cell block admired Williams.

Stated plainly, the evidence fails to show that Williams was in any way coerced into making incriminating statements to Conway. See Gannon, 531 F.3d at 661–62 (affirming denial of motion to suppress where "no credible evidence suggested that [the defendant's] statements were involuntary" and the defendant's testimony was "incredulous"). Accordingly, there is no Fifth Amendment violation.

## 2.   Sixth Amendment Challenge

Williams also argues that he should have had counsel present before being questioned by the government on charges for which he previously invoked his Fifth Amendment right to remain silent. See Simmons v. Bowersox, 235 F.3d 1124, 1132 n.3 (8th Cir. 2001) ("To say that a person must clearly and consistently assert his desire to remain silent does not mean that he must repeat his clearly asserted desire to remain silent in order to halt continued questioning." (citation omitted)). Williams's claim that he previously asserted his right to remain silent stems from his arrest in

-22-

Arizona. That arrest pertained to charges of possessing marijuana for sale, possessing drug paraphernalia, and forgery. By contrast, the offense about which Conway questioned Williams in Nebraska, and for which Williams was subsequently indicted, was conspiring to distribute and possess with the intent to distribute marijuana.

The Supreme Court in Texas v. Cobb held that "when the Sixth Amendment right to counsel attaches, it . . . encompass[es] offenses that, even if not formally charged, would be considered the same offense under the Blockburger test." 532 U.S. 162, 173 (2001). That test asks "whether each [offense] requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932). As is pertinent here, possessing a drug with the intent to distribute it is a separate and distinct offense from conspiring to possess and distribute the drug. See Pinkerton v. United States, 328 U.S. 640, 643 (1946) ("It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses."); United States v. Frayer, 9 F.3d 1367, 1373 n.3 (8th Cir. 1993) ("To sustain a conviction for possession with intent to distribute, the government must prove . . . that the defendant knowingly possessed and intended to distribute an illegal drug. To convict a defendant of conspiracy to distribute . . . the government must prove an agreement between two or more people, including the defendant, for the purpose of engaging in distribution of drugs." (citations omitted)).

Accordingly, because the offense about which Conway questioned Williams is a different offense under Blockburger from the offense for which Williams invoked his Fifth Amendment right to remain silent in Arizona, Williams's Sixth Amendment right to counsel was not violated.[13]

---

[13]We note one additional point regarding Williams's Sixth Amendment challenge. At the time that Conway questioned Williams in their cell, Williams had not yet been charged with the Count I conspiracy offenses; rather, Williams was being held at the detention center in Omaha for violating conditions of his supervised

-23-

D.  District Court's Trial Conduct

Williams's third argument pertains to the district court's alleged unfairness towards him at trial before an empaneled jury.  Specifically, Williams claims that the district court's conduct "strayed from that of an impartial jurist and appeared to place [the judge] in favor of the government's position."   This Court reviews the district court's trial management for an abuse of discretion.  United States v. Rojas, 520 F.3d 876, 881 (8th Cir. 2008).

1.  Exclusion of Audio Recordings

Williams's principal objection to the trial is that the district court unfairly hurried him during his *pro se* presentation of evidence.  Williams wanted to admit into evidence 170 hours—more than four weeks' worth—of audio recordings, rather than rely on the government's excerpts.  The district court told Williams that "if you feel that there's something wrong with [the government's] [excerpts], I'll give you the opportunity to . . . add to them if you want," but the district court did not permit Williams to play all 170 hours.

We first note that Williams, who tried the case *pro se*, was given access to and presumably did listen to all 170 hours of the taped conversations.  Yet, Williams has not pointed to a single recorded comment or conversation that was not included in the

---

release.   Accordingly, Williams's Sixth Amendment right to counsel for the conspiracy charge had also not attached independent of any other charges.  See Beck v. Bowersox, 362 F.3d 1095, 1101 (8th Cir. 2004) ("[T]he Sixth Amendment right to counsel attaches when the State initiates an adversary judicial proceeding 'by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972) (plurality opinion))).

-24-

excerpts submitted by the government and that supports his claim that an attorney–client relationship existed between Haddock and him.[14]

Nevertheless, Williams asserts on appeal that "[i]t is troubling that Judge Strom advised that he would not place the entirety of the recordings into evidence because of the volume of material." We note, however, that "considerations of undue delay" and "waste of time" are permissible reasons for a trial court to refuse to admit evidence. United States v. Coutentos, 651 F.3d 809, 821 (8th Cir. 2011) (citing Fed. R. Evid. 403). Moreover, Williams's request to add the entirety of the audio recordings, after failing to take the district court up on its offer to supplement the government's excerpts, is contrary to the proper procedure for admitting an excluded conversation. United States v. Webber, 255 F.3d 523, 526 (8th Cir. 2001) ("[T]he party urging admission of an excluded conversation must 'specify the portion of the testimony that is relevant to the issue at trial and that qualifies or explains portions already admitted.'" (quoting United States v. Sweiss, 814 F.2d 1208, 1212 (7th Cir. 1987))). Finally, Williams never provides any explanation as to *how* the additional hours of audio recordings would have aided in his defense—only that it was error to exclude them. Such an assertion, unaccompanied by an explanation of the alleged resulting prejudice, is not sufficient to find an abuse of discretion. See Wilson v. City of Des Moines, 442 F.3d 637, 641 (8th Cir. 2006) ("Only when the evidence excluded is of such a critical nature that there is 'no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted' has a district court so abused its discretion." (quoting Stephens v. Rheem Mfg. Co., 220 F.3d 882, 885 (8th Cir. 2000))); cf. United States v. Wallette, 686 F.3d 476, 483 (8th

---

[14]After this case was submitted, Williams filed a complaint against his appellate counsel for conceding at oral argument that he (counsel) did not independently listen to the taped conversations in preparation for this appeal. We leave this issue for a 28 U.S.C. § 2255 proceeding, but note that to date, Williams, who has listened to the tapes, has been unable to point to any portion of the tapes that would support his position that Haddock maintained an attorney–client relationship with him.

Cir. 2012) (denying the defendant's motion for a new trial and stating that "[e]ven if Defendant's Exhibit . . . was not available to the jury during its deliberations, [the defendant] has not established that the omission prejudiced him[]"); <u>Saunders v. United States</u>, 236 F.3d 950, 953 (8th Cir. 2001) (no prejudice in ineffective-assistance claim where the defendant "made no showing of what other witnesses were available, *how* they would have testified, and *why* such additional evidence would likely have affected the result" (emphases added)).

In view of the "great deference" that we accord to the district court regarding the admissibility and probative value of evidence, <u>United States v. Anderson</u>, 446 F.3d 870, 873 (8th Cir. 2006), we do not believe that the district court abused its discretion by refusing to allow Williams to play all 170 hours of audio recordings.

## 2.  District Court's Remarks During Trial

Williams also claims that the district court made comments to him in front of the jury that were a "rebuke" and that "reflect[ed] the general disdain in which Judge Strom held Mr. Williams."  These comments pertain primarily to Williams's *pro se* presentation of evidence and, more specifically, to Williams's duplicative questioning of witnesses.  In particular, Williams points to several instances in which the district court told him to "move on" to a different subject.  Williams claims that these remarks demonstrate a "loss of neutrality" and sent a "subtle signal of favoritism to the jury."  "[T]he balance [between a judge's comments and the overall fairness of trial] is adversely tipped against the defendant in a criminal trial where the judge's role loses its color of neutrality and tends to accentuate and emphasize the prosecution's case."  <u>United States v. Lueth</u>, 807 F.2d 719, 727 (8th Cir. 1986) (first alteration in original) (citation and internal quotation marks omitted).  Reversal is warranted where "the court's comments throughout a trial are one-sided and interfere with a defendant's case to such an extent that the defendant is deprived of the right to a fair trial."  <u>United States v. Warfield</u>, 97 F.3d 1014, 1027 (8th Cir. 1996).

-26-

Williams relies on United States v. Singer, 710 F.2d 431 (8th Cir. 1983) (en banc), for his argument that the district court "inappropriately injected itself into the proceedings in such a way that calls into question whether the jury was impartial." The facts of Singer, however, are materially distinguishable from this case.  In Singer, the district court actively participated in the defendants' trial to help the government on substantive matters.  For example, the district court assisted the prosecution in making objections to defense counsel's questioning of witnesses, see id. at 433; commandeered the prosecution's questioning of witnesses and gave "hint[s]" to the prosecution regarding what questions to ask, see id. at 433–34; and conjured up excuses for the prosecution when the government's attorney made a misstatement at trial, id. at 435.  In one instance, the district court stated that it had, up to that point in time, been "try[ing] the Government's case for it," id. at 433 (internal quotation marks omitted), and in another instance stated that it was "helping the Government to try its case," id. at 435–36 (internal quotation marks omitted).[15]

After reviewing the record, we find no abuse of discretion in the district court's attempts to avoid either duplicative evidence or Williams's unnecessarily lengthy presentation of evidence, or both.  In contrast to Singer, the district court's statements

---

[15]This Court summarized the trial court's comments in Singer as follows:

> [M]ost of the court's interventions were designed to clarify government testimony, to help government counsel, to indicate to government counsel when he should or should not make objections, to instruct government counsel on how to make his evidence more intelligible, to suggest to [government counsel] when he should stop the examination of a witness, to indicate to [government counsel] what he should write on a blackboard in order to illustrate a point to the jury, and the like.

710 F.2d at 436.

-27-

to "move on" that Williams claims demonstrate a bias against him pertain to trial management and trial efficiency—not the substantive questioning of witnesses. See Webber, 255 F.3d at 526 (noting the district court's "broad discretion to conduct the trial in an orderly and efficient manner"); Harrington v. Iowa, 109 F.3d 1275, 1280–81 (8th Cir. 1997) (noting trial judges' "wide latitude in conducting their trials" and that "comments . . . generally related to the management of a criminal trial" do not "render the trial unfair in a constitutional sense"). Moreover, Williams concedes that his *pro se* presentation of evidence was "more contentious and less artful . . . than [that of] an attorney" and that at times his advocacy efforts may have "appeared excessive." Yet, Williams claims that "Judge Strom's impatience with Mr. Williams, as a *pro se* litigant, caused him to lose his perspective as a neutral figure." Williams is correct that he is entitled to act his own attorney; however, that Williams chose to proceed *pro se* does not entitle him to play by a different set of rules at trial, see Saunders, 236 F.3d at 953 (no "special treatment" given to § 2255 petitioner based on *pro se* status), and it is within the trial court's discretion to "impose reasonable time limits on the presentation of evidence," Life Plus Int'l v. Brown, 317 F.3d 799, 807 (8th Cir. 2003).

Finally, beyond Williams's unsupported allegations, there is no evidence that the district court, as "governor of the trial for the purpose of assuring its proper conduct," Dranow v. United States, 307 F.2d 545, 572 (8th Cir. 1962) (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)), in any way improperly "colored" the jury's verdict. See United States v. White, 557 F.3d 855, 858 (8th Cir. 2009) (no abuse of discretion for district court's "admonitions that [defense] counsel keep his questions relevant and proceed with his case"); United States v. Scott, 26 F.3d 1458, 1464–65 (8th Cir. 1994) (defendant's allegation that the district court appeared "agitated" with him not sufficient to warrant new trial). Williams points to one instance in which the district court stated to him, "You're not concerned about anybody but yourself, I can see that." As Williams recognizes, however, this comment was made during a sidebar and thus does not present the same concerns as

-28-

the district court's comments in Singer, which were made primarily in front of the jury. See 710 F.2d at 436 (expressing concern that "the jury could well have inferred that the judge was siding with the government").

In sum, this was a very long,[16] difficult, and contentious trial, made more difficult by Williams's *pro se* status. Williams's cross-examination of witnesses, objections to testimony and exhibits, and presentation of evidence was often rambling and repetitive. A review of the record shows that, rather than any bias, Judge Strom demonstrated remarkable patience and a careful attention to Williams's rights in the trial of this case. Accordingly, Williams's argument that the jury's verdict should be set aside because of allegedly improper trial conduct fails.

## E.  Williams's *Pro Se* Arguments

In his separately filed *pro se* brief, see supra note 5, Williams raises several additional issues not presented by his counsel pertaining to, *inter alia*, Williams's motion to sever his trial from one of his coconspirators, the defense of entrapment, and the admissibility of fingerprint cards. We address these arguments below. Arguments that Williams raised in his *pro se* brief that are not discussed below have been carefully considered by the Court and determined to be meritless. See, e.g., United States v. Minnis, 489 F.3d 325, 334 (8th Cir. 2007).

---

[16]Williams's trial lasted eighteen days.

-29-

## 1.  Motion to Sever Trial

Williams claims that the district court erred in not granting his motion to sever his trial from that of Deshawn Hernandez, one of his coconspirators.[17]  The crux of Williams's argument is that he was prejudiced by Hernandez's testimony that Williams abused her and coerced her into committing the crimes relating to the drug conspiracy and money laundering.  We review a district court's denial of a severance motion for an abuse of discretion and reverse only upon a showing of "severe or compelling prejudice."  United States v. Mann, 685 F.3d 714, 718 (8th Cir. 2012) (quoting United States v. Rimell, 21 F.3d 281, 289 (8th Cir. 1994)) (internal quotation marks omitted).  "Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that he would have had in a severed trial."  United States v. Koskela, 86 F.3d 122, 126 (8th Cir. 1996).

In United States v. Delpit, this Court stated the following:

> The presumption against severing properly joined cases is strong. . . . [C]o-defendants are often hostile to one another, and one will try frequently to "point the finger," to shift the blame, or to save himself at the expense of the other.  "Antagonistic" defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*.

94 F.3d 1134, 1143 (8th Cir. 1996) (citation and internal quotation marks omitted).  Here, Williams has not even alleged (let alone demonstrated) that Hernandez's testimony caused the jury to improperly impute her involvement in the marijuana conspiracy to Williams; rather, Williams complains of Hernandez's testimony regarding past incidents of physical abuse and statements that Williams allegedly

---

[17]Hernandez was indicted for the same Count I and Count II offenses and was tried and convicted alongside Williams.

-30-

made to her about a murder for which he was acquitted.  While these statements may not paint Williams in the best light as a caring and loving individual or law-abiding citizen, they do not speak at all to the merits of the offenses for which Williams was on trial—conspiracy to possess and distribute marijuana and money laundering—and Williams has not shown that "the jury [was] unable to compartmentalize the evidence" as between Hernandez and him.  United States v. Mickelson, 378 F.3d 810, 818 (8th Cir. 2004); see United States v. Flores, 362 F.3d 1030, 1041 (8th Cir. 2004) ("A defendant does not have a right against having his codefendant elicit testimony which may be damaging to him.").

Further, we note that the district court gave a limiting instruction that Hernandez's testimony "may be considered only in connection with her defense of coercion.  It is not admissible to prove defendant Williams committed the crimes alleged in Count I and Count II of the indictment."  The court also instructed the jury that it should "entirely disregard, and be uninfluenced by, any inclination toward a personal prejudice against a defendant."   Williams has not alleged that these instructions were insufficient to "cure any risk of prejudice" due to the joint trial. United States v. Kuenstler, 325 F.3d 1015, 1024 (8th Cir. 2003) (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)) (internal quotation marks omitted) (severance denied).  Accordingly, the district court did not abuse its discretion in denying Williams's motion to sever.

## 2.  Entrapment

Williams also claims that the government entrapped him as a matter of law into selling marijuana and laundering money.  Specifically, Williams points to the following conversation that he had with Haddock in the detention center:

> HADDOCK: I got a friend [who] needs some weed, she says it's a drought out there right now.

-31-

> WILLIAMS: Oh yeah?
>
> HADDOCK: Yeah, be a good opportunity to make some money.
>
> WILLIAMS: I'm through selling weed.  I've done enough.
>
> HADDOCK: Well, as your business advisor[,] I'm telling you this is a good time to be selling weed.

Williams also points to the following exchange at trial where Williams questioned Haddock as a witness:

> WILLIAMS: Tell the jury what things you offered to do for me, Mr. Haddock, that I have said no to.
>
> HADDOCK: I had offered to drive money down to Arizona for you or bring drugs back and you had said no—up until that time you had said no.

"The defense of entrapment recognizes that '[l]aw enforcement officers go too far when they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.'" United States v. Myers, 575 F.3d 801, 805 (8th Cir. 2009) (alteration in original) (emphasis deleted) (quoting Jacobson v. United States, 503 U.S. 540, 553 (1992)).  "A valid entrapment defense involves two interrelated elements: [1] government inducement of criminal conduct and [2] an absence of criminal predisposition on the part of the defendant." Id.  "Because the entrapment defense requires factual determinations about government conduct and its likely effect upon a defendant, '[t]he question of entrapment is generally one for the jury, rather than for the court.'" Id. (alteration in original) (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)).  Nevertheless, "[w]e will conclude that the defendant was entrapped *as a matter of law* only if the

-32-

evidence clearly shows [1] that 'the government agent developed the criminal plan *and* [2] that the defendant was not predisposed to commit the crime independent of the government's activities.'" Id. (emphases added) (quoting United States v. Kurkowski, 281 F.3d 699, 701 (8th Cir. 2002)).

Without making a determination as to the inducement element, Williams's entrapment argument fails for at least the reason that he cannot demonstrate that he "was not predisposed to commit the crime[s] independent of the government's activities." Mathews, 485 U.S. at 63; see, e.g., United States v. Young, 613 F.3d 735, 747–48 (8th Cir. 2010) (assuming inducement but denying relief based on a determination that the defendant was predisposed); United States v. Berg, 178 F.3d 976, 980 (8th Cir. 1999) (same). "Predisposition, the principal element in the defense of entrapment, focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." Mathews, 485 U.S. at 63 (quoting Sherman v. United States, 356 U.S. 369, 372 (1958)) (internal citation and quotation marks omitted). Testimony at trial revealed that Williams had been involved in a marijuana conspiracy since as early as 2006, and it was not until 2009 that Haddock made his first visit to Williams at the detention center. In view of Williams's criminal activity that occurred prior to meeting Haddock and that pertained to the same offenses for which he was subsequently indicted, the government has met its burden of proof that Williams was predisposed to the subject criminal activity for purposes of entrapment. See Young, 613 F.3d at 747 ("Once government inducement is established by the defendant, the burden shifts to the government to demonstrate beyond a reasonable doubt that the defendant was predisposed to commit the crime.").

Accordingly, Williams's argument that he was entrapped as a matter of law into committing the conspiracy and money-laundering crimes fails.

-33-

### 3.  Admission of Fingerprint Cards

Williams also claims that the district court erred by admitting into evidence fingerprint cards from his arrest in Arizona under the alias "Donald Jarmon."  At trial, the government called James Brady, a fingerprint specialist from Omaha, Nebraska, to testify that "Donald Jarmon's" fingerprints obtained in Arizona in January 2009 matched Williams's fingerprints (obtained from either his arrest in Minnesota or previous run-ins with the law).  Williams argues that his Confrontation Clause right was violated when the government failed to present for cross-examination the person who took "Donald Jarmon's" fingerprints in Arizona.  Williams asserts that, absent the fingerprint cards that allegedly tie him to the several hundred pounds of marijuana that "Donald Jarmon" was caught possessing in Arizona, there would be a hole in the government's case against him for the conspiracy charge.  We review *de novo* the district court's decision to admit evidence in the face of an objection based on the Confrontation Clause.  United States v. Lee, 374 F.3d 637, 643 (8th Cir. 2004).

In relevant part, the Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  U.S. Const. amend. VI.  In Crawford v. Washington, the Supreme Court held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. 36, 68 (2004).  The Court subsequently determined that a statement is "testimonial" where its "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006).  The Court applied Crawford and Davis in Melendez-Diaz v. Massachusetts and held that affidavits regarding the chemical composition of a seized substance were "testimonial" and that the affiants (laboratory analysts) were "witnesses" for purposes of the Confrontation Clause. 557 U.S. 305, 310, 311 (2009).  The Court reasoned that "not only were the affidavits made under circumstances which would lead an objective witness reasonably to believe that the statement would

-34-

be available for use at a later trial," but that "the *sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." Id. at 311 (internal citations and quotation marks omitted). Shortly after, in Bullcoming v. New Mexico, the Court extended Melendez-Diaz's holding and determined that the person who conducts a laboratory test—not merely a colleague knowledgeable about the testing procedures and equipment used—must be available for cross-examination to satisfy the Sixth Amendment's confrontation requirement. __ U.S. __, 131 S. Ct. 2705, 2716 (2011) ("[Q]uestioning one witness about another's testimonial statements [does not] provide[] a fair enough opportunity for cross-examination.").

We do not believe that the Supreme Court's concerns regarding confrontation in Melendez-Diaz and Bullcoming are present here with respect to the fingerprint cards. Unlike the evidence in those cases, the fingerprint cards were created as part of a routine booking procedure and not in anticipation of litigation, *i.e.*, "for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." Melendez-Diaz, 557 U.S. at 324; see, e.g., United States v. Diaz-Lopez, 403 F. App'x 199, 202 (9th Cir. 2010) ("The [fingerprint] card contains only ministerial, objective observations[,] . . . was not created in anticipation of litigation[,] and is not testimonial."). Our determination is bolstered by the fact that the entity that took Williams's fingerprints—Arizona law enforcement—was unaware that Williams was wanted in Nebraska in connection with the marijuana conspiracy and, further, did not arrest Williams for conspiracy-related charges in Arizona. By contrast, the excluded evidence deemed to be "testimonial" in both Bullcoming and Melendez-Diaz and went straight to the heart of the offenses for which the petitioners in those cases were respectively charged. See Bullcoming, 131 S. Ct. at 2709 (petitioner charged with driving while intoxicated and the evidence at issue was a forensic report regarding the defendant's blood–alcohol level); Melendez-Diaz, 557 U.S. at 308 (petitioner charged with distributing and trafficking cocaine and the

-35-

evidence at issue was "certificates of analysis" regarding the composition of seized substance).

We conclude that the fingerprint cards are business records admissible pursuant to Federal Rule of Evidence 803(6) because they were created "in the regular course of business," Melendez-Diaz, 557 U.S. at 321–22, and not "solely for an 'evidentiary purpose,'" Bullcoming, 131 S. Ct. at 2717. See, e.g., United States v. Mashek, 606 F.3d 922, 930 (8th Cir. 2010) (pseudoephedrine logs kept "in the ordinary course of business" do not implicate Confrontation Clause). Accordingly, Williams's Sixth Amendment Confrontation Clause right was not violated.

## II. Forfeiture Claim

### A. Factual Background

As we previously noted, the July 20, 2010 superseding indictment against Williams included a criminal forfeiture count for certain real and tangible properties obtained as a result of the marijuana conspiracy. Federal Rule of Criminal Procedure 32.2(b)(5)(A) provides as follows:

> In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, *the court must determine before the jury begins deliberating* whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict.

(Emphasis added.)[18]  The district court did not comply with this Rule at trial,

_____

[18]Rule 32.2(b)(5)(A) was amended on December 1, 2009 to place the burden on the court. Previously, the Rule read: "*Upon a party's request* in a case in which the jury returns a verdict of guilty, the jury must determine whether the government

-36-

however, and permitted the jury to begin deliberating without asking the parties whether they wanted to retain the jury in the event that it would find Williams guilty.

On June 30, 2011, Williams moved to dismiss with prejudice the criminal forfeiture count due to the district court's noncompliance with Rule 32.2(b)(5)(A). The government opposed, and the district court denied Williams's motion. Then, on October 21, 2011, the government moved to dismiss the criminal forfeiture count, stating that it would seek forfeiture of the subject properties through a separate civil proceeding. Williams opposed, and the district court granted the government's motion without prejudice pursuant to Federal Rule of Criminal Procedure 48(a). The government subsequently filed an *in rem* civil complaint against Williams's assets on October 27, 2011, and on December 16, 2011, the government requested that the district court enter a default judgment. The district court granted the government's request on January 27, 2012, and entered a default judgment on March 9, 2012.

Williams now makes three arguments on appeal. First, Williams argues that the district court erred in denying his motion to dismiss with prejudice the criminal forfeiture account due to the district court's failure to comply with Rule 32.2(b)(5)(A). Second, Williams argues that the district court erred in granting, without prejudice, the government's motion to dismiss the criminal forfeiture count pursuant to Rule 48(a). Third, Williams argues that even if the district court did not err regarding the disposition of the two dismissal motions themselves, the government's *in rem* civil proceeding against the same assets named in the criminal forfeiture count violates the Double Jeopardy Clause. We address and reject each of Williams's arguments below.

---

has established the requisite nexus between the property and the offense committed by the defendant." (Emphasis added.)

B.  Denial of Williams's Motion to Dismiss with Prejudice

The standard of review on a ruling regarding a motion to dismiss an indictment varies based on the grounds for dismissal.  Contrast United States v. Howe, 590 F.3d 552, 555 (8th Cir. 2009) (*de novo* review for dismissal based on double-jeopardy and collateral-estoppel grounds), with United States v. Rodriguez, 414 F.3d 837, 842 (8th Cir. 2005) (abuse-of-discretion review for dismissal based on false testimony presented to grand jury).  In this instance, we review *de novo* the district court's dismissal of the indictment.  United States v. Timley, 507 F.3d 1125, 1128 (8th Cir. 2007) (*de novo* review regarding district court's interpretation and application of the federal forfeiture laws).

From our research on the issue, we have found only one decision—United States v. Evick, 286 F.R.D. 296 (N.D.W. Va. 2012)—that has considered the propriety of a defendant's motion to dismiss a forfeiture count after the trial court did not comply with amended Rule 32.2(b)(5)(A) and that has facts similar to this case.[19]

---

[19]The Ninth Circuit dealt with the same issue in United States v. Mancuso, __ F.3d __, Nos. 12-30174, 12-30201, 2013 WL 1811276 (9th Cir. May 1, 2013), but based on nonanalogous facts.  In Mancuso, the government brought to the court's attention, after the jury announced a guilty verdict, the fact that Rule 32.2(b)(5)(A) had not been followed, and defense counsel "stated that she 'understood' that the district court [not the jury] would make the forfeiture decision."  Id. at *13.  The district court then declined to grant forfeiture, and the government appealed.  The Ninth Circuit reversed, noting that "[t]he purpose of the 2009 amendment was to avoid an *inadvertent* waiver of the right to a jury determination," id. (emphasis added) (citation and internal quotation marks omitted), but that the defendant "did not 'inadvertently' waive his right to a jury determination of forfeiture," id.  The court then concluded that the error was harmless.  Id.

The government in this case made the following allegation in its opposition to Williams's motion to dismiss the forfeiture count: "Shortly after the conclusion of the trial, [Williams's] stand-by counsel was heard to say, 'I don't know how [the judge is] going to get around the forfeiture procedure,' or words to that effect, supporting the

-38-

In <u>Evick</u>, "[n]o party requested that the jury be retained for a determination of the forfeitability of specific property. In addition, [the district court] did not make a specific determination as to whether either party wanted the jury to make such a[] determination." <u>Id.</u> at 297. "As such, after the jury returned its guilty verdict as to both defendants, the jury was released." <u>Id.</u> The defendant subsequently moved to dismiss the criminal forfeiture count on the ground that "the jury did not make any finding regarding the forfeiture of specific property," <u>id.</u>, and the court denied the defendant's motion, <u>id.</u> at 299.

The <u>Evick</u> court relied on <u>United States v. Martin</u>, 662 F.3d 301 (4th Cir. 2011), *cert. denied*, __ U.S. __, 132 S. Ct. 1953 (2012),[20] to determine that the

---

inference that he was aware [that] Fed. R. Crim. P. 32.2(b)(5)(A) required the Court to make inquiry of the parties." If that were true, <u>Mancuo</u>'s reasoning would apply insofar as Williams's waiver of a jury determination was not "inadvertent." Although Williams does not respond to this allegation in his reply brief for the motion, there is nevertheless no record of the statement being made, and "[t]here is no way that statements made in an off-the-record [conversation] can be reliably reconstructed at this point." <u>Pool Thunder v. United States</u>, 810 F.2d 817, 820 n.1 (8th Cir. 1987).

[20]In <u>Martin</u>, the district court failed to reference the forfeiture proceedings when sentencing the defendants and did not include orders of forfeiture in the final judgment, as required by then-applicable Federal Rule of Criminal Procedure 32.2(b)(3). <u>See</u> 662 F.3d at 306–07. "In fact, the district court failed to enter the preliminary order of forfeiture until after it entered judgments and did not enter a final order of forfeiture until months later." <u>Id.</u> at 307. The defendants argued on appeal that the district court's failure to comply with the Rule 32.2(b)(3) deadlines relating to forfeiture deprived the district court of jurisdiction to later enter the final forfeiture orders. <u>See id.</u> The Fourth Circuit disagreed based on its classification of the Rule 32.2(b)(3) deadline as a "time-related directive" deadline and "refuse[d] to vacate the district court's tardy forfeiture orders." <u>Id.</u> at 309–10.

This Court recently cited Martin in United States v. Shakur, 691 F.3d 979, 987 (8th Cir. 2012), a case with facts similar to <u>Martin</u>. <u>Shakur</u> touches upon amended Rule 32.2(b)(5)(A) insofar as the court noted that "[t]he timing of the [trial court's]

-39-

Rule 32.2(b)(5)(A) requirement imposed upon a district court is merely a "time-related directive" deadline, Evick, 286 F.R.D. at 298, *i.e.*, "a deadline 'that is legally enforceable but does not deprive a judge or other public official of the power to take the action to which the deadline applies if the deadline is missed,'" Martin, 662 F.3d at 308 (quoting Dolan v. United States, 130 S. Ct. 2533, 2538 (2010)).[21] The Evick court then looked at several of factors that weighed in favor of this classification. *First*, "although Rule 32.2(b)(5)(A) includes the word 'must,' it did not specify a consequence for noncompliance." Evick, 286 F.R.D. at 298. *Second*, "the main purpose of criminal forfeiture is to deter future crimes by depriving a criminal defendant of the fruits of illegal conduct, not to protect defendants." Id. *Third*,

---

request [for a jury determination of forfeiture] violated Rule 32.2(b)(5)(A)." Id. at 985 n.2. However, neither defendant in Shakur moved to dismiss the forfeiture count because of the violation and, without any further analysis, the court stated only that "th[e] violation appears to be harmless." Id. Regarding the violations that were also the subject of Martin, the Shakur court noted that it would be "reluctant to follow the panel majority in Martin . . . to the interpretation of Rule 32.2(b), without considering the [Supreme] Court's statement in United States v. Addonizio, 442 U.S. 178, 189 & n.16 (1979), that 'once a sentence has been imposed, the trial judge's authority to modify it is' limited to Rule 35." 691 F.3d at 988 n.6. However, the violation of Rule 32.2(b)(5)(A) in this case does not present the same concerns as in Shakur and Martin. Here, the district court did not order criminal forfeiture at *any* time; rather, the district court dismissed the forfeiture count against Williams on October 26, 2011, and Williams's sentence was subsequently imposed on November 4, 2011. Thus, the above-quoted language from Addonizio that gave pause to the Shakur court to follow Martin on issues relating to Rule 32.2(b) is not at play here.

[21]That is, a "time-related directive" deadline as opposed to either (1) a "jurisdictional" deadline—one that "prevents the court from permitting or taking the action to which the statute attached the deadline," *e.g.*, deadline for filing an appeal—or (2) a "claims-processing rule" deadline—one that "do[es] not limit a court's jurisdiction, but rather regulate[s] the timing of motions or claims brought before the court," *e.g.*, deadline for filing a motion for a new trial in a criminal case. Martin, 662 F.3d at 307–08 (alterations in original) (quoting Dolan, 130 S. Ct. at 2538–39) (internal quotation marks omitted).

-40-

"preventing forfeiture on the court's failure to meet a deadline imposed by Rule 32.2 could hurt the individuals that such forfeiture was intended to benefit, including the victims." Id. *Fourth*, the court recognized that Rule 32.2(b)(5)(A) "merely applies to a jury determination of the forfeitability of specific property," not the amount of liability—as with money damages—and thus the purpose of the deadline for inquiring as to whether to retain the jury could not be to provide the defendant with certainty as to liability. Id.; see United States v. Gregoire, 638 F.3d 962, 972 (8th Cir. 2011) ("Rule [32.2] by its plain language applies only to 'the forfeitability of specific property.' As the government disclaimed any intent to seek forfeiture of specific property, there was no issue for the jury." (citing United States v. Tedder, 403 F.3d 836, 841 (7th Cir. 2005) ("Rule 32.2 does not entitle the accused to a jury's decision on the *amount* of forfeiture." (emphasis added)))). *Finally*, the Evick court noted that "forfeiture is mandatory upon conviction of a defendant[,] [and] the Fourth Circuit has specifically ruled that a district court does not have the discretion to ignore a statutory forfeiture provision." Evick, 286 F.R.D. at 298.

We agree with and adopt the Evick court's reasoning regarding Dolan's classification of procedural deadlines as applied to amended Rule 32.2(b)(5)(A). See supra note 21 and accompanying text. Additionally, like the Fourth Circuit, we have also determined that post-conviction forfeiture is mandatory when certain statutory language requires it. See United States v. 318 S. Third St., 988 F.2d 822, 827–28 & n.9 (8th Cir. 1993) (differentiating between criminal statutes providing that property "*may* be seized and forfeited" and those that provide that property *shall* be forfeited (emphasis added) (internal quotation marks omitted)). In fact, we have made that determination in specific reference to the criminal forfeiture statute at issue here. United States v. Bieri, 68 F.3d 232, 235 & n.1 (8th Cir. 1995) ("[C]riminal forfeiture under [21 U.S.C. § 853(a)] is mandatory, not discretionary."); see United States v. Adetiloye, __ F.3d __, 2013 WL 1845520, at *7 (8th Cir. May 3, 2013) (applying Dolan and stating that "we must not lose sight of the purpose of the statute").

Accordingly, we affirm the district court's denial of Williams's motion to dismiss with prejudice the criminal forfeiture count of the superseding indictment.

## C. Grant of the Government's Motion to Dismiss without Prejudice

Federal Rule of Criminal Procedure 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent." We review for an abuse of discretion the district court's grant of the government's motion to dismiss the superseding indictment without prejudice. United States v. Jacobo-Zavala, 241 F.3d 1009, 1011 (8th Cir. 2001) (standard of review for Rule 48(a) motions).

Williams asserts that the district court erred in granting without prejudice the government's motion to dismiss for two principal reasons. First, Williams argues that "Rule 48(a) requires both leave of the court *and* consent of the defendant when seeking to dismiss during trial." (Emphasis added.) As Williams recognizes, however, "the Government's Motion to Dismiss was filed after a complete trial, submission of the evidence to the jury, and a returned verdict." Although it is the rare case in which the prosecution will move to dismiss an indictment after a trial is complete and verdict rendered, Rule 48(a) requires the government to obtain the defendant's consent to dismiss the prosecution only "during trial," and Williams has not cited any authority that requires the government to likewise seek the defendant's consent after trial. Therefore, all that the government needed was leave of court, which the district court granted.[22]

---

[22]In his reply brief, Williams points out correctly that the government did not identify Rule 48(a) as the grounds for dismissal in its motion to dismiss, and only on appeal—after the district court granted the motion pursuant to Rule 48(a)—did the government adopt that Rule as its basis for seeking dismissal. We note, however, that Williams failed to make this lack-of-basis argument in both his opposition to the

-42-

Williams's second argument is that the district court's grant of the government's motion to dismiss without prejudice "has the potential to lead to the absurd result of having [a] full trial on the merits, verdict reached and entered, and then a Rule 48(a) Motion to Dismiss filed because the Government is dissatisfied with the outcome." We note two points regarding this argument.  First, the government could not bring another *criminal* forfeiture count against Williams because jeopardy attached at the time that his jury was empaneled and sworn.  U.S. Const. amend V; United States v. Peoples, 360 F.3d 892, 894 (8th Cir. 2004).  Second, so long as it is not punitive in nature, a *civil* forfeiture action does not implicate double jeopardy and is "merely [a] different aspect[] of a single prosecution."[23]  United States v. Jones, 111 F.3d 597, 599 (8th Cir. 1997) (quoting United States v. Smith, 75 F.3d 382, 386 (8th Cir. 1996) (internal quotation marks omitted)).  Thus, there was nothing preventing the

_____

government's motion and his initial brief on appeal.  See United States v. Coplen, 533 F.3d 929, 930 (8th Cir. 2008) ("This Court ordinarily will not address issues raised for the first time in an appellant's reply brief.").  Further, Williams has not cited any authority requiring a party to refer specifically to the Federal Rules when seeking leave of the court or, alternatively, forbidding a court from granting leave based on a Federal Rule where the party did not refer to the Rule.

[23]Williams's stand-alone argument that the government's *in rem* civil case against his assets violates his right under the Fifth Amendment's Double Jeopardy Clause also fails.  Specifically, Williams claims that the separate forfeiture case, "while civil in nature, include[s] the same properties titled in Mr. Williams's name as were included in the criminal forfeiture allegation" and that, as a result, the government is "trying to take a second bite at the forfeiture apple."   This argument is foreclosed by United States v. Ursery, in which the Supreme Court held that "*in rem* civil forfeitures are neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause."  518 U.S. 267, 292 (1996).  This Court has commented on the "breadth" of Ursery by noting that it applies to "both property directly acquired as a result of drug sales and property used in connection with the production or transportation of controlled substances."  United States v. One 1970 36.9' Columbia Sailing Boat, 91 F.3d 1053, 1057 n.3 (8th Cir. 1996).

-43-

government from bringing a related civil forfeiture proceeding against Williams's assets after his criminal trial—let alone maintaining a separate civil proceeding *during* his criminal trial, see Smith, 75 F.3d 382 at 386 (no cause for concern when parallel civil forfeiture complaint filed two days after related criminal indictment)—regardless of whether the district court granted the government's motion to dismiss.  See Jones, 111 F.3d at 599–600 (no cause for concern where civil forfeiture action initiated prior to criminal trial, stayed pending prosecution, and the stay lifted and civil proceedings continued after the defendants were convicted); see also United States v. Maull, 855 F.2d 514, 515 (8th Cir. 1988) (government not barred by *res judicata* from initiating criminal forfeiture count "involv[ing] essentially the same property" as an already-dismissed civil forfeiture action).

Accordingly, the district court did not err in granting the government's motion to dismiss the criminal forfeiture count, and Williams did not suffer any prejudice.

### III.  Pending Motions

Both before and after oral argument, Williams filed a plethora of motions that were ordered taken up with the merits of this case.  Prior to oral argument, Williams moved separately to correct the trial transcript and to supplement the record on appeal; those motions are denied.  Williams also moved for a subpoena *duces tecum* regarding audio files of the trial proceedings; that motion is also denied.  After the case was submitted, Williams moved for sanctions against the government's attorney for allegedly making knowing misrepresentations of material facts at oral argument; that motion is denied.  Williams also moved for reconsideration of an order denying his request to file a post-argument supplemental *pro se* reply brief; that motion is also denied.

All other motions, including the complaint against his appellate counsel, see supra note 14, are denied without prejudice.  To the extent that any of the motions or

-44-

other filings by Williams pertain to issues that could be raised in a 28 U.S.C. § 2255 motion, *e.g.*, ineffective assistance of counsel, Williams may raise those issues by way of an appropriately and timely filed motion pursuant to § 2255.

### IV.  Conclusion

For the reasons set forth above, we hold the following:

- The district court did not err in denying Williams's motion to dismiss the superseding indictment or, alternatively, suppress Williams's statements made to attorney Haddock.

- The district court did not err in denying Williams's motion to suppress statements made to Conway.

- The district court did not abuse its discretion by refusing to admit all 170 hours of recordings or through its comments regarding Williams's *pro se* presentation of evidence.

- The district court did not abuse its discretion in denying Williams's motion to sever his trial from that of Deshawn Hernandez.

- Williams was not entrapped as a matter of law into committing the Count I and Count II offenses.

- The district court did not err in admitting the fingerprint cards of "Donald Jarmon."

- The district court did not err in denying Williams's motion to dismiss the criminal forfeiture count and did not abuse its discretion in granting the government's motion for same. Additionally, Williams's right to be free from double jeopardy was not violated by the government's *in rem* civil forfeiture complaint.

- The judgment and sentence of the district court are affirmed.

-45-

_____

-46-